OPINION OF THE COURT
Richard Lee Price, J.
On October 23, 1981 the defendant was convicted of kidnapping in the first degree (Penal Law § 135.25 [1]) and related crimes. Mr. Bell was sentenced to a term of 20 years to life imprisonment. Briefly, he and two others attempted to rob a man outside of the man’s apartment. The robbery was not successful and the intended victim was able to retreat back into his apartment, but in doing so he left his three-year-old daughter and his friend behind in the hallway. The friend talked his way out of the situation and left; the would-be robbers took the child and then concocted a scheme to blackmail the victim and his wife. But this effort was foiled as well, the men were arrested, and the child was recovered without harm.
None of the actions of the defendant or the other two men in any way contained or even intimated a sexual component. Nonetheless, upon his December 2001 release from prison to lifetime parole, the defendant was notified that the Sex Offender Registration Act (SORA) (Correction Law § 168 et seq.) deems him to be a “sex offender” because, under the definition of kidnapping in the first degree (Penal Law § 135.25 [1]), the *775 victim of the kidnapping was “less than seventeen years old and the offender is not the parent of the victim.” (Correction Law § 168-a [2] [a] [i].) Accordingly, he was told to appear in court so that his classification level could be determined. At that appearance the defendant, through his assigned counsel, argued that because he was never accused of any form of sexual impropriety toward the child (or anyone else), applying the act to him was “arbitrary and capricious” and violated his constitutional rights.
By decision and order of August 1, 2002, this court determined that, pursuant to the statute, Mr. Bell is subject to the classification and registration provisions of the Sex Offender Registration Act because his crime is among the enumerated crimes to which the act applies. (Correction Law § 168-a [2] [a].) A second hearing was ordered to determine what level of classification Mr. Bell should be assigned. At that hearing the defendant, again through his appointed counsel, more specifically argued that application of the SORA to him violated his constitutional rights under the Due Process, Equal Protection, and Ex Post Facto Clauses.
However, those arguments were neither briefed nor fully developed on the record and, because these issues were inchoate, by decision and order of October 22, 2002, this court did not reach them. Instead, defendant was duly classified as a level 1 “Sex Offender,” thereby imposing the lowest registration level. However, the decision also noted the seeming unfairness of applying the SORA to the defendant and labeling him a “sex offender” when (1) there was no sexual offense inherent in the facts of the defendant’s crimes, and (2) the two codefendants, both of whom were also convicted of kidnapping but were released from prison and completed their parole before the SORA went into effect, are not subject to the act.
Accordingly, by order to show cause signed November 22, 2002, this court’s October 22, 2002 order was stayed upon the defendant’s motion to reargue the prior determinations, and this time he specifically delineated the impact of the SORA upon him. The moving papers fully briefed the arguments addressed to the asserted violation of the defendant’s rights under the constitutional Ex Post Facto, Due Process, and Equal Protection Clauses. The People submitted an opposing brief and defendant has filed a reply memorandum of law. The motion is now deemed submitted for decision. As the parties acknowledge, the issues raised are ones of first impression in this state, and the court wishes to express its gratitude to counsel on both sides for the excellence of their submissions.
*776 The Ex Post Facto Clause
The Ex Post Facto Clause of the United. States Constitution (art I, § 10 [1]) states that “No State shall . . . pass any ... ex post facto Law . . . thereby prohibiting the imposition of retroactive punishment on a person convicted of a crime.[1] The classic American definition of an ex post facto law, now over 200 years old, was set forth by Justice Chase in Calder v Bull (3 Dallas [3 US] 386, 390 [1798]): “1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.”
However, as repeatedly explained by the United States Supreme Court, “Although the ‘presumption against retroactive legislation is deeply rooted in our jurisprudence,’ Landgraf v. USI Film Products, 511 U.S. 244, 265 . . . (1994), the Ex Post Facto Clause of the Constitution ‘applies only to penal statutes which disadvantage the offender affected by them,’ Collins v. Youngblood, 497 U.S. 37, 41 (1990).” (Doe v Pataki, 120 F3d 1263, 1272 [2d Cir 1997], cert denied 522 US 1122 [1998]; see also Calder v Bull, supra, 3 Dallas [3 US] at 390-394.) The Court of Appeals for the Second Circuit found in Doe v Pataki, and the United States Supreme Court has recently reaffirmed in Smith v Doe (538 US 84 [2003]), that state sex offender registration laws which were fashioned £o comply with the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program (42 USC § 14071) (such as New York’s) are not intended as criminal punishments or enhancements, but are essentially civil in nature. Accordingly, application of the SORA to a person convicted of a crime cannot be a violation of the Ex Post Facto Clause.
Defendant argues that, because he did not commit a sexual offense, the application of the SORA to him punitively aggravated his crime, making it greater than it was at the time it was committed. However, as the People respond, both the *777 Second Circuit’s 1997 decision in Doe v Pataki (supra), and the Supreme Court’s decision in Smith v Doe (supra [which was handed down subsequent to the filing of defendant’s moving papers]), have settled the question conclusively. Understandably, defendant has abandoned any mention of this prong of his argument in his reply memorandum.
The Due Process Clause(s)
Both the Federal and New York State Constitutions guarantee procedural and substantive due process in a person’s dealings with federal, state, and local governments. (See US Const 5th Amend [“No person shall ... be deprived of life, liberty, or property, without due process of law”], 14th Amend, § 1 [“nor shall any State deprive any person of life, liberty, or property, without due process”]; NY Const, art I, § 6 [“No person shall be deprived of life, liberty or property without due process of law”].)
Procedural due process protection affords notice (hopefully in advance) of a possible deprivation of life, liberty or property by the government, and a meaningful opportunity to contest the deprivation prior to its imposition (or if not prior to, in a time and manner that itself will afford sufficient redress if the deprivation is found to be unconstitutional). “The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.” (Mathews v Eldridge, 424 US 319, 348 [1976] [internal quotation marks and citations omitted].)
By contrast, a claim of a substantive due process violation bars “certain government actions regardless of the fairness of the procedures used to implement them.” (County of Sacramento v Lewis, 523 US 833, 840 [1998] [internal quotation marks omitted], quoting Daniels v Williams, 474 US 327, 331 [1986].)
“We have emphasized time and again that ‘[t]he touchstone of due process is protection of the individual against arbitrary action of government,’ Wolff v. McDonnell, 418 U.S. 539, 558 .. . (1974), whether the fault lies in a denial of fundamental procedural fairness, see, e.g., Fuentes v. Shevin, 407 U.S. 67, 82 . . . (1972) (the procedural due process guarantee protects against ‘arbitrary takings’), or in the exercise of power without any reasonable justification in the service of a legitimate governmental *778 objective, see, e.g., Daniels v. Williams, 474 U.S., at 331 . . . (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised) . . . [D]ue process protection in the substantive sense limits what the government may do in both its legislative, see, e.g., Griswold v. Connecticut, 381 U.S. 479 . . . (1965), and its executive capacities, see, e.g., Rochin v. California, 342 U.S. 165 . . . (1952), [and] criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.” (Id. at 845-846.)
The People note that Mr. Bell was given proper notice and, thereafter, a full hearing to determine the level of classification he should be subjected to. Therefore, they conclude, he has been afforded all the process he is due.
However, Mr. Bell does not argue that he has been deprived of procedural due process. Rather, he asserts that it is his substantive due process rights that are abridged by application of the SORA to him, and the procedural guarantee of a hearing to contest only the gravity of his classification is irrelevant in his case, because the hearing would not have been held but for the presupposition that the law is validly applied to him. (See Collins v City of Harker Hgts., Tex., 503 US 115, 125 [1992] [Due Process Clause “protects individual liberty against ‘certain government actions regardless of the fairness of the procedures used to implement them’ ”], quoting Daniels v Williams, 424 US 327 at 331 [1986].) Mr. Bell argues that because the purpose of the SORA is to identify and protect the public from sexual offenders and predators — and he is neither — the Sex Offender Registration Act, as applied to him, is an unconstitutional violation of the Constitution’s guarantee of substantive due process.
Obviously, defendant carries a heavy burden in sustaining his claim. In general, the government may regulate and thereby cut back on our rights and liberties so long as the governmental action bears a rational relationship to a legitimate governmental interest. (Federal Communications Commn. v Beach Communications, 508 US 307, 313 [1993] [“In areas óf social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld ... if there is any reasonably conceivable . . . basis for the classification”]; Moe v Dinkins, 669 F2d 67, 68 [2d Cir 1982] [rational relation test properly applied *779 because the right of minors to marry is not a fundamental right deserving of strict scrutiny], cert denied 459 US 827 [1982].)
Chief Justice Rehnquist has further expounded:
“Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, ‘deeply rooted in this Nation’s history and tradition,’ id., at 503 (plurality opinion); Snyder v. Massachusetts, 291 U.S. 97, 105 (1934) (‘so rooted in the traditions and conscience of our people as to be ranked as fundamental’), and ‘implicit in the concept of ordered liberty,’ such that ‘neither liberty nor justice would exist if they were sacrificed,’ Palko v. Connecticut, 302 U.S. 319, 325, 326 (1937). Second, we have required in substantive-due-process cases a ‘careful description’ of the asserted fundamental liberty interest. [Reno v Flores, 507 US 292, 302 (1993); Collins v Harker Hgts., 503 US 115, 125 (1992); Cruzan v Director, Mo. Dept. of Health, 497 US 261, 277-278 (1990).] Our Nation’s history, legal traditions, and practices thus provide the crucial ‘guideposts for responsible decisionmaking,’ Collins, supra, at 125, that direct and restrain our exposition of the Due Process Clause. As we stated recently in Flores, the Fourteenth Amendment ‘forbids the government to infringe . . . “fundamental” liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.’ 507 U.S., at 302 ....
“[T]he development of this Court’s substantive-due-process jurisprudence, described briefly above, . . . has been a process whereby the outlines of the ‘liberty’ specially protected by the Fourteenth Amendment — never fully clarified, to be sure, and perhaps not capable of being fully clarified — have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition. This approach tends to rein in the subjective elements that are necessarily present in due-process judicial review. In addition, by establishing a threshold requirement — that a challenged state action implicate a fundamental right— before requiring more than a reasonable relation to *780 a legitimate state interest to justify the action, it avoids the need for complex balancing of competing interests in every case.” (Washington v Glucksberg, 521 US 702, 720-722 [1997] [Rehnquist, Ch. J.].)
To satisfy the first prong of showing that he has identified a fundamental right, defendant invokes the United States Supreme Court’s decision in Paul v Davis (424 US 693 [1976]), which held that a public defamatory injury, or harm to reputational interests, if it is properly combined with some specific, demonstrable harm to a person’s “more tangible interests such as employment,” can constitute a liberty interest worthy of substantive due process protection. (Id., 424 US at 701.) As part of its explanation of its reasoning, the Davis court quoted Justice Douglas’s concurring opinion in Joint Anti-Fascist Refugee Comm. v McGrath (341 US 123 [1951]): “This is not an instance of name calling by public officials. This is a determination of status — a proceeding to ascertain whether the organization is or is not ‘subversive.’ This determination has consequences that are serious to the condemned organizations. Those consequences flow in part, of course, from public opinion. But they also flow from actions of regulatory agencies that are moving in the wake of the Attorney General’s determination to penalize or police these organizations.” (Id., 341 US at 175.)
Reaching the second prong, defendant points to the decision of the New York Court of Appeals in People v David W. (95 NY2d 130, 137 [2000]) which held, on both state and federal due process grounds, that the
“[defendant’s private interest, his liberty interest in not being stigmatized as a sexually violent predator, is substantial (see, E.B. v Verniero, 119 F3d 1077, 1107 [3d Cir]; Doe v Pataki, 3 F Supp 2d 456, 469 [SD NY]). The ramifications of being classified and having that information disseminated fall squarely within those cases that recognize a liberty interest where there is some stigma to one’s good name, reputation or integrity, cóupled with some more ‘tangible’ interest that is affected or a legal right that is altered. (Matter of Lee T.T. v Dowling, 87 NY2d 699, 708 [1996] [placing petitioners’ names on Central Register of Child Abuse and Maltreatment foreclosed future child care employment, and. satisfied ‘stigma plus’ test] . . .).”
Indeed, as our High Court had noted in Matter of Lee T.T. v Dowling,
*781 “The potential loss of employment as either a child psychologist or a foster parent, or of the right to pursue adoption of a child are substantial interests. The government’s characterization of petitioners as child abusers affects not only their present employment in the child care field or as foster parents; it effectively bars them from obtaining similar employment or benefits in the future. Moreover, the characterizations of Joel and Aracelis as child abusers has cost them the care of a child they were in the process of adopting and, realistically, it has foreclosed any possibility of future adoption. Thus, for these petitioners the State’s action has compromised some of life’s most important interests, earning a livelihood in one’s chosen field and establishing a family. Indeed, the stigma of being branded a child abuser may extend well beyond employment in the child care field to prevent employment in any field.” (Id., 87 NY2d at 710.)
As for him, defendant avers, through his attorney, that he “has been placed in the Special Offender Unit (S.O.U.) of Parole, which oversees all parolees required to register under SORA. Although his registration requirement is currently stayed by this Court, the special conditions of S.O.U. have been in effect for Mr. Bell since his release. Accordingly, unlike regular parolees, Mr. Bell has a 9:00 p.m. curfew. At 46 years old, Mr. Bell must seek special permission from his parole officer to attend a movie in the evening with a date, or even to work late. He cannot leave his house after dark on certain child-focused holidays, such as Halloween. He must attend classes or counseling, as the S.O.U. sees fit, to address his ‘sex offender’ status. One of the requirements of completing such a course is the admission that he is a sex offender, and a signed acknowledgment of that designation. All these special conditions, and more, apply to Mr. Bell solely because he has been placed in the special offender unit of parole. He has been placed in the S.O.U. solely because he was convicted of an offense that forces him to register as a sex offender under SORA.”[2] Counsel goes on to note that these conditions are in addition to the statutory require *782 ments that he provide and report current information of his address, driver’s license, and the like, register annually for 10 years, and the fact that his classification as a “sex offender” will be accessible to the public through a special 900 phone number.
Indeed, were his level designation set higher than a level 1, the conditions put upon him by the SORA would be even greater. And yet, a higher level designation, as was urged by the People, would still not establish him as a classic sex offender for the purposes of the statute. Altogether, given the discussions by the Court of Appeals in general, and the specific enumeration by defendant of the special parole “conditions” he is now or will be subject to, Mr. Bell has satisfied the requirement of showing “defamation-plus” by providing a “careful description” of the asserted fundamental liberty interest that is implicated by the SORA.[3]
The People respond that “[djefendant cannot point to a fundamental right traditionally protected by society that is violated when a person who engages in predatory behavior against a child that has strong linkage to sexual abuse is included under the nomenclature that he is a sex offender. As discussed in the context of equal protection, there is a rational basis to include kidnappers of young children with those who commit sex crimes because abduction is; often a frightening element of sexual abuse.”
There does not appear to be any sensé to these two sentences that is not circular and tautological. The defendant was not convicted of committing a predatory crime and kidnapping does not have a strong link to sexual abuse, although it certainly may be an element in certain sexually motivated attacks. Therefore, as discussed, I find the defendant has amply satisfied the two-prong test laid down by the Court.
Having concluded that a fundamental ¡right is implicated, this court must apply strict scrutiny to determine if, nonetheless, *783 there is any compelling state interest which would justify the People’s insistence that Mr. Bell must be subject to the SORA classification and registration requirements. For this we begin with the stated purpose of the act. “Legislative purpose or findings: The legislature finds that the danger of recidivism posed by sex offenders, especially those sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior, and that the protection of the public from these offenders is of paramount concern or interest to government.” (L 1995, ch 192, §§ 1, 3, eff Jan. 21, 1996 [emphasis added];[4] see also People v Stevens, 91 NY2d 270, 274-275 [1998].)
As noted, this issue is one of first impression in New York. But the question has arisen in other states and their treatment of it is instructive. Under the version of the Wetterling Act adopted in the State of Ohio, the issue has arisen a number of times. In State v Washington (2001 Ohio 8905, 2001 WL 1415568, 2001 Ohio App LEXIS 4980 [Ct App, 11th Dist, Nov. 14, 2001]), the court was faced with the question of whether a hearing was required to classify a person pursuant to his conviction for a kidnapping which, like here, had absolutely no sexual component.[5] While that court avoided stating a specific constitutional clause underpinning its analysis, it appeared to *784 be basing its conclusion on both the Equal Protection and (substantive) Due Process Clauses:
“While the General Assembly had a legitimate reason to enact the sexual predator statute, we fail to see how the purpose of the statute is furthered when there is absolutely no evidence that the offense committed was sexual in nature. What is not clear to this court in the instant matter is how the adjudication of a defendant convicted of abducting his infant daughter during a domestic dispute, which was in no way sexually motivated, protects the public from sexual offenders. Thus, we determine that there is no rational relationship between this legitimate governmental interest and the imposition of the sexually oriented offense label upon appellant under the particular facts of this case.
“Our decision today should not be viewed as condoning appellant’s conduct. Under a proper showing, a defendant may, indeed, fit the classification of a sexually oriented offender when the abduction was committed for a sexual purpose. This was not the case in the instant matter.
“In summation, we hold that unless there is evidence of sexual motivation, there is no rational basis for categorizing an abduction of a victim who is less than eighteen years old as being a sexually oriented offense. Rather, in such instances, a trial court should have some discretion in determining whether a defendant is a sexually oriented offender. Absent a showing that the abduction was motivated for a sexual purpose, appellant’s classification as a sexually oriented offender cannot stand.” (Id., 2001 Ohio 8905, 2001 WL 1415568, *3-4, 2001 Ohio App LEXIS 4980, *13-14.)
Earlier this year the Second Appellate District of the Court of Appeals of Ohio, citing Washington, agreed, and was more specific: “Because we conclude that the application of the statutory requirement that Reine be classified as a sexually oriented offender, in a case in which it has been stipulated that his offenses were committed without any sexual motivation or purpose, is unreasonable and arbitrary, and bears no rational relationship to the purposes of the statute, we conclude that it offends the Due Process Clauses of both the Ohio and United States constitutions.” (State v Reine, 2003 Ohio 50, ¶ 28, 2003 WL 77174, *5, 2003 Ohio App LEXIS 52, *14 [Ct App, 2d Dist, Jan. *785 10, 2003]; see also State v Barksdale, 2003 Ohio 43, 2003 WL 77115, 2003 Ohio App LEXIS 46 [Ct App, 2d Dist, Jan. 10, 2003] [same result]; State v McClellan, 2002 Ohio 5164, 2002 WL 31160074, 2002 Ohio App LEXIS 5208 [Ct App, 10th Dist, Sept. 30, 2002] [distinguishing Washington because there were clear sexual overtones to the murder McClellan committed].)
At least one Florida appellate court has agreed. In Robinson v State (804 So 2d 451 [Fla Dist Ct App, 4th Dist 2001]), the defendant was convicted of carjacking and kidnapping a baby girl who was not his child. The Florida District Court of Appeal found that his statutorily mandated, automatic inclusion in the state registry of sex offenders violated his right to substantive due process of law.[6]
“The section’s broad definition of sexual predator does not pass the rational relationship test. The rational relationship test applies because . . . kidnappers such as Robinson are not a part of a suspect or quasi-suspect class. See F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313 . . . (1993)
(Tn areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld ... if there is any reasonable conceivable basis for the classification.’).
“While the statute may have been based on the premise that providing the community with relevant information about certain types of offenders was a reasonable way to help them protect themselves and their children, we hold that the language used goes beyond that purpose when applied in this case. Designating a person such as Robinson as a sexual predator when there is no sexual element to his crime would lead to an absurd result. The legislature could have achieved the same remedial goals, for example, by patterning [the Florida statute] after the federal standard and, thus, specifically targeting those defendants who commit crimes against children regardless of any sexual element. By instead pigeonholing defendants such as Robin *786 son into the same category as sexual predators, it has effectively subjected them to an unwarranted stigma. This is not only unjust, it is legally unsound. Accordingly, we reverse the designation.” (Robinson v State, supra, 804 So 2d at 453.)
So too here, Mr. Bell’s automatic inclusion in the sex offender registry at some level is clearly “unjust” and “legally unsound.” None of Mr. Bell’s actions in kidnapping the three-year-old child were done for the purpose of sexual victimization of the child, and there is no assertion that during the period in which she was held for ransom the child was in any way molested or sexually abused. Yet, he may be required to take a course and “admit” to being something he is not! Clearly, to require him to register as a “sex offender” is completely arbitrary and unreasonable, having no substantial relation to the public morals or general sexually charged safety issues which the SORA was enacted to safeguard against. (Cf. Village of Euclid, Ohio v Ambler Realty Co., 272 US 365, 395 [1926] [“it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare”].)
The Equal Protection Clause(s)
Mr. Bell’s final assertion is that the SORA requirement that he submit to being classified and thereafter register with local law enforcement authorities is a violation of his right to equal protection under the law. Both the Federal and New York State Constitutions guarantee this right. (See US Const, 14th Amend, § 1 [“nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws”]; NY Const, art I, § 11 [“No person shall be denied the equal protection of the laws of this state or any subdivision thereof’].)
In analyzing equal protection claims, courts are to be guided by the principle that “a legislative classification is not violative of equal protection of the laws if any state of facts rationally justifying it is demonstrated or perceived by the court.” (Matter of Pratt v Tofany, 37 AD2d 854, 855 [2d Dept 1971] [citations omitted].) Looking again to the purpose behind the statute (see People v Stevens, supra, 91 NY2d 270, 274-275 [1998] [protection of the community from the dangers of recidivism by sex offenders, and to assist law enforcement in the investigation and prosecution of sex offenders]), defendant asserts that, while he *787 is not a member of a suspect class such as a racial minority (People v Walker, 81 NY2d 661, 668 [1993]), even under the minimum test, as articulated in Matter of Pratt v Tofany (supra), there is simply no rational relationship between classification and registration of nonsex offenders such as himself and the otherwise legitimate governmental interests of the SORA statute. “They are labeled, by the state, as sex offenders when they are not. . . It is also not rational to differentiate between people convicted of non-sexual but registerable offenses, such as kidnapping, and people who commit other, non-registerable, crimes of a non-sexual nature against children.”
The People cite the decision in People v Fuller (324 III App 3d 728, 756 NE2d 255 [1st Dist 2001]) and argue that there is a “linkage between kidnapping of minors and the connection to sexual crimes against children,” thus providing a rational basis for that crime’s inclusion among the list of registerable offenses. In the Fuller case, that court opined that “kidnaping or unlawful restraint of a minor is often a precursor offense to juvenile pimping or exploitation of a child.” (324 III App 3d at 733, 756 NE2d at 260.)
Certainly, the inclusion of kidnapping makes perfect sense in a situation such as befell young Jacob Wetterling,[7] but it is nonetheless difficult to perceive any reason for the broad sweep *788 of including all kidnappers of children, ¡such as the Bronx man who kidnapped the Lindbergh baby. Indeed, the conviction of Bruno Hauptman for the Lindbergh infant’s murder would not have subjected him to classification and registration under SORA as discussed above, the Ohio courts appear to agree, with one court specifically deciding, on equal protection grounds, that without a clear showing that an ábduction of a child was motivated for a sexual purpose, there is no rational basis for categorizing every kidnapping as a sexually oriented offense and classifying a defendant accordingly. (State v Washington, supra, 2001 Ohio 8905, 2001 WL 1415568, 2001 Ohio App LEXIS 4980 [Ct App, 11th Dist, Nov. 14, 2001].) Similarly, in Raines v State (805 So 2d 999 [Fla Dist Ct App, 4th Dist 2001]), the District Court of Appeal of Florida found that ‘¡[including an offender convicted of false imprisonment in the definition of ‘sexual offender,’ without a concomitant sexual component, renders the sexual offender registration statute overinclusive” and violates the Equal Protection Clause. (805 So 2d at 1003.)
In response to both the procedural due process and equal protection challenges, the People alternatively argue that should this court “determine that labeling defendant as a sex offender is unfair, that should not render applicability of the registration requirements unconstitutional as it applies to him ... If this court were to find the labeling of defendant invalid, it should then direct that the verification form signed by defendant be amended to list him as one who committed an offense against a child. To conclude that the registration requirement is inapplicable to defendant would not serve the proper and necessary goal of protecting the children in our community.”
While this argument has some facial appeal, it is unworkable and unsatisfactory because it both goes too far but does not go far enough. As the defendant correctly notes, the New York State Legislature chose to adopt only the sex crimes component of the Jacob Wetterling Crimes Against, Children and Sexually Violent Offender Registration Program' (supra), and it did so without any reference to the Wetterling Act’s more general “crimes against children” component. To now require a separate registry would, in essence, legislate by judicial fiat. For this *789 court to now add such a component would be wholesale judicial legislation outside the province and power vested in it. (See People v Owusu, 93 NY2d 398 [1999] [refusing to expand the meaning of “dangerous instrument” to include a defendant’s teeth]; Matter of William W., 188 Misc 2d 630, 633 [Fam Ct, Wayne County 2001] [judicial legislation is “a rewriting of the statute in a way the Legislature presumptively declined to do”].)
Rather, this court’s task is to try “to make sense of a statutory [provision] whose meaning was the focus of the case.” (People v Owusu, supra, 93 NY2d at 406.) In Owusu (at 406), the Court “looked to its precedents and the legislative history of the statute,” and confined the language to its plain meaning in accord with the act’s intendment. “To now change the statute’s sweep will unsettle the careful statutory scheme of increased criminal liability arising from the use, or threatened use, of a dangerous instrument, and will result in applications that are without common sense.” (Id. at 406.) So, too, here. Accordingly, this court agrees with the Ohio courts (see State v Washington, supra, 2001 Ohio 8905, 2001 WL 1415568, 2001 Ohio App LEXIS 4980 [Ct App, 11th Dist 2001]), that an automatic application of SORA to a defendant such as Mr. Bell is unconstitutional as applied. Conviction of any crime where classification under SORA is mandatory but no element of the crime itself involves an improper sexual component requires a hearing, at which there must be presented evidence of some sexual facet to the defendant’s actions or motivations sufficient to sustain a classification as a sexual offender.
Accordingly, this court finds that the SORA as applied to Mr. Bell violates the Equal Protection and the Due Process Clauses of both the United States and New York State Constitutions. By finding the statute to be unconstitutional as applied, it is this court’s judgment that hereafter it should be left to the discretion of the courts, on an individual basis, to make an appropriate determination. In other words, whenever a defendant, who is convicted of a registerable offense that does not in and of itself contain a sexual component, challenges his being subjected to the SORA, the court will hold a hearing to determine if there is a rational basis for doing so. If a rational basis is so found, the court should then proceed to apply strict scrutiny to the specific application of the statute to a defendant such as Mr. Bell.
Here, because Mr. Bell has satisfied this court that he is not properly subject to classification and registration under the *790 SORA, his motion to reargue is granted and, upon reargument, his motion to declare the statute unconstitutional as applied to him is granted. Accordingly, the Division of Parole is permanently enjoined from requiring him to register, placing him in their special offender unit, or in any other manner treating him as a sexual offender.

. Unlike the Federal Due Process and Equal Protection Clauses, the Ex Post Facto Clause has no homologue in the New York State Constitution.

. Counsel’s assertions are further buttressed by the defendant’s affidavit, submitted in support of an order to show cause application directed at the Division of Parole contesting the imposition of S.O.U. restrictions upon him during the pendency of this motion, in derogation of this court’s stay of his classification.

. Mr. Bell does not specifically aver it, but the restrictions on his being allowed to be with children or even open his door after 4:00 P.M. on certain holidays, such as Halloween, also appear to implicate his constitutionally-protected “freedom of association.” (See Roberts v United States Jaycees, 468 US 609, 617-618 [1984] [“choices to enter into and maintain certain intimate human relationships must be secured against uhdue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty”]; Matter of Lee T.T. v Dowling, supra, 87 NY2d 699 [1996].)

. The remaining text reads as follows (L 1995, ch 192, § 1):
“The system of registering sex offenders is a proper exercise of the state’s police power regulating present and ongoing conduct. Registration will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly. It will allow them to alert the public when necessary for the continued protection of the community.
“Persons found to have committed a sex offense have a reduced expectation of privacy because of the public’s interest in safety and in the effective operation of government. In balancing offenders[’] due process and other rights, and the interests of public security, the legislature finds that releasing information about sex offenders to law enforcement agencies and, under certain circumstances, providing access to limited information about certain sex offenders to the general public, will further the primary government interest of protecting vulnerable populations and in some instances the public, from potential harm.
“Therefore, this state’s policy, which will bring the state into compliance with the federal crime control act 42 U.S.C. 170101, is to assist local law enforcement agencies’ efforts to protect their communities by requiring sex offenders to register and to authorize the release of necessary and relevant information about certain sex offenders to the public as provided in this act.”

. Unlike the second-tier classification of “sexual predator,” under the Ohio statute, application of the various factors was not mandated to find the lowest level of “sexual offender,” which was automatic by operation of law.

. As will be discussed later, the Florida courts have also similarly found, on equal protection grounds, that there is no such rational basis for classifying as sex offenders those who do not commit a crime with any sexual component. (See Raines v State, 805 So 2d 999 [Fla Dist Ct App, 4th Dist 2001].)

. The story of Jacob Wetterling first achieved national attention in late 1989. Briefly, this is what happened: 11-year-old Jacob (Jake) Wetterling, his brother and a friend were biking home from a convenience store during the evening hours of October 22, 1989. They were approached by an unidentified Caucasian man wearing a mask and dark-colored clothing, and armed with a shotgun. The man ordered all three boys to lie down in a nearby ditch. He asked Jacob’s brother’s age, then told him to run away and not look back or he would get shot and did the same with Jacob’s friend. After letting those two boys go, the man grabbed Jacob. The suspect walked toward a wooded area with Wetterling shortly afterwards. Neither of them have been heard from again. Authorities received two possible tips about Wetterling’s case during the early stages of the investigation. Witness reported seeing an unidentified man in his 50s inside the convenience store. He was in his 50s, about six feet tall with a large build and receding white hair. Two months after Jacob disappeared, an unidentified man molested a 12-year-old boy approximately 10 miles from the location of Wetterling’s disappearance. The boy had just finished ice skating and was walking home alone when he was pulled into a car and molested. Afterwards he was pushed out, with the man instructing the boy to run from the area or risk being shot. The latter suspect’s description matched Wetterling’s abductor, as did the manner of the crime, but sketches of both men failed to produce any leads in Wetterling’s case. Many officials believe that the abductor may have followed the boys from the store, kidnapping Wetterling afterwards. Jacob’s father believes his son was stalked, possibly for several days, before he was abducted. Wetter ling’s *788 family still lives in the same home they lived in back in 1989 and they have the same phone number. They have received several phone messages from people claiming to be Wetterling, but the calls always turned out to be hoaxes. His later family members founded The Jacob Wetterling Foundation, an organization devoted to missing children. (See <//www.jwf.org/>.)